**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **TE CONNECTIVITY CORPORATION,** | : CIVIL ACTION No. |
| | : |
| **Plaintiff,** | : |
| | : |
| **v.** | : |
| | : |
| **CONVERCENT, INC.,** | : |
| | : **JURY TRIAL DEMANDED** |
| **Defendant.** | : |

## COMPLAINT

Plaintiff, TE Connectivity Corporation, submits the following Complaint against the defendant.

### I.  Parties.

**1.**  Plaintiff, TE Connectivity Corporation (hereinafter "TE"), is a Pennsylvania corporation with offices and its principal place of business located at 1050 Westlakes Drive, Berwyn, PA 19312.

**2.**  Defendant, Convercent, Inc. (hereinafter "Convercent), is a Delaware corporation with its principal place of business located at 3858 Walnut Street, Suite 255, Denver, CO 80205.

### II.  Jurisdiction and Venue.

**3.**  This Court has jurisdiction on the basis of diversity of citizenship, 28 U.S.C. §1332. Plaintiff is a Pennsylvania corporation with principal place of business in Pennsylvania. Defendant is a Delaware corporation with offices and principal place of business in Colorado. The amount in controversy, exclusive of interest and costs, exceeds $75,000.00.

**4.**      Venue is proper under 28 U.S.C. §1391(b)(2) in that a substantial part of the events or omissions giving rise to the claim occurred in the Eastern District of Pennsylvania.

**III. Facts Common to All Counts**.

**5.**      On or about September 29, 2017, TE entered into a "Master Software As a Service (Hosting) Agreement" (the "Agreement") with Convercent, under which Convercent agreed to provide TE with products and modules via a website and mobile application that would allow individuals to make reports via an online web portal or via telephone, including anonymous reports, of potential ethics violations, violations of law, policies, TE standard processes, the TE Guide to Ethical Conduct, and other complaints, and to enable TE to investigate, manage and triage the reported concerns, generate reports and analytics on the reported concerns, and allow for communication both with internal teams conducting the investigations as well as with identified and anonymous reporters. A true and correct copy of the Agreement is incorporated by reference herein and attached as Exhibit "A."

**6.**      Under the terms of the Agreement, the applicable law is that of the State of New York.

**7.**      The Agreement was entered into following a selection process in which TE identified and requested proposals from several third-party providers, including Convercent.

**8.**      Convercent representatives knew at the time of the selection process that the reporting system was an essential part of TE's business operations, in that a reporting system hosted by an independent third party is required by law in certain countries in which TE does business, and because maintaining a confidential reporting hotline to receive concerns, thoroughly investigate these concerns, and resolve concerns lodged by TE employees and third parties is and was essential to TE's business model.

2

9.     Convercent representatives knew at the time of the selection process that TE was using the "IntegriLink" reporting and case management system provided by Navex Global, Inc., and that TE has been using "IntegriLink" since approximately 2007. Convercent specifically represented during the selection process that the Convercent system would provide a more integrated, efficient and streamlined hotline reporting and case management system and advanced analytics and reporting capability.

10.     Convercent representatives also knew at the time of the selection process that TE was and is a global company with offices and production facilities in numerous countries, that many employees and other potential users of the system were non-English speaking, and that a robust translation system was essential to the effective operation of the reporting system.

11.     Convercent knew at the time of the selection process that TE would be required to invest large sums of money and large amounts of time and effort to ensure the success of the project to migrate over 10 years of data from "IntegriLink" and implement the Convercent system, and that the project would require a high level of trust and confidence, confidentiality, and candor such that a special relationship existed between TE and Convercent, which required Convercent to at all times provide truthful and accurate information.

12.     As an inducement for TE to enter into the Agreement, Convercent representatives, including but not limited to Scott Serrano, Account Executive and Erin Dominguez, Customer Success Manager and Project Lead, specifically represented that Convercent had the products, experience, and technical know-how to provide, in essence, a "turn key" system capable of functioning immediately in place of TE's then-current system, and that Convercent had provided similar systems to other companies who migrated from "IntegriLink" to Convercent.

13.     Specifically, in a June 21, 2017, response to Request for Proposal, Exhibit "B" hereto, Convercent represented, *inter alia,* that:

3

- Convercent provides "unmatched reporting and analytics capabilities," providing "immediate and deep insight into data and trends;"

- Convercent had global languages capabilities including, "24-7-365" access to professional translators in over 300 languages; offered over 40 languages on the web intake channel; and offered free in-app translation capability that would instantly translate into English with the click of a button; and

- Convercent had successfully migrated data from Navex into Convercent for organizations with hundreds of investigators and ten times TE's anticipated report volume spanning ten years of investigations.

14.     At the time these statements were made, Convercent representatives knew that those statements were untrue, and/or recklessly disregarded the truth or falsity thereof, because in fact Convercent had no such products, and lacked the knowledge, experience, and technical know-how to develop them, and in effect would be required to "invent" the systems required to fulfill their objectives under the contract.

15.     At an August 2017 meeting at TE's Middletown, Pennsylvania, campus, Convercent's National Sales Executive, Scott Serrano, further represented to TE that Convercent had its own dedicated call center to accept hotline calls.

16.     Mr. Serrano also represented at that meeting that Convercent would have available its "Insights Advanced Analytics" product, which would provide enhanced metrics, analytical, and reporting capabilities, and would be ready for use when the Convercent system became operational.

17.     Mr. Serrano also provided assurances that Convercent knew how to map data from the "IntegriLink" system to Convercent, and that the process would accurately and completely transfer the data in usable form that could be accessed by TE within the Convercent

4

system. Convercent also claimed to have previously migrated other similarly sized companies to TE, who were successfully migrated from the "IntegriLink" system to the Convercent system, and that Convercent had experience and the experts to assist TE with this migration, data mapping, and implementation; further assuring TE that this system would be operational as companies have conducted similar migrations and implementations from the IntegriLink system TE was previously operating with to Convercent..

     **18.**     TE selected Convercent as its supplier, after interviewing and reviewing offerings from a field of other candidates and entered into the Agreement in reliance on Convercent's representations as to its products and capabilities that were known to be false to Convercent.

     **19.**     The project was set to begin immediately upon execution of the Agreement, with a "go live" target date of January 1, 2018; although this date was later adjusted to February 1, 2018, due to unrelated delays in obtaining necessary telephone lines.

     **20.**     Almost immediately upon commencement of the implementation phase, problems and deficiencies with Convercent's product, expertise and technical know-how became apparent. Despite prior representations by Convercent representatives that migration of data from Integrilink and implementation on the Convercent system could and would be performed seamlessly, Convercent was unable to "map" the data from TE's existing systems over to the new Convercent system, such that the data would arrive on Convercent's platform in unusable form.

     **21.**     Convercent was unable to correct the numerous errors prior to the system going "live" on February 1, 2018, the result of which was that data from TE's legacy system was unavailable, missing, or erroneous. This unavailable, missing, or erroneous data caused TE harm by severely constraining TE's ability to generate reports on enterprise wide data, inhibited TE from providing actionable intelligence gained form an analysis of the cases being reported,

caused TE to continue to rely on the static data captured from the IntegriLink system TE migrated

away from, and did not adequately enable TE to timely manage and triage concerns reported into the

new Convercent system.

22.     Convercent's "Insights Advanced Analytics" product was never made available and

did not exist in usable form at any time prior to termination for cause as set forth below.

23.     Convercent did not have and never successfully developed an in-app translation

service for reports made via the website, and instead suggested that TE "cut and paste" confidential

reports in foreign languages and, for example, upload them into Google or Bing to translate.

24.     Due to its inability to accurately "map" data from the Navex platform to Convercent's

system, Convercent simply gave up and recommended that TE archive ten years worth of historical

data such that it could no longer be accessed on the new system.

25.     Due to Convercent's breaches, fraud, and gross negligence, TE was unable to manage or

manipulate the data in the Convercent system, and instead relied on extracts from "IntegriLink," which

TE had to create, merge, and manually generate, in order to report on cases, trends, and analytics, thereby

causing TE to continue using two (2) systems in order to manage cases. Additionally, TE's users were

forced to manually search databases outside of the Convercent system for necessary information and to

input, produce, and transmit reports in an unusable format.

26.     Convercent's promised training, implementation assistance, and customer support

were never provided or were completely inadequate.

27.     Despite repeated verbal and written complaints and notices delivered to, among others,

Patrick Quinlan, Convercent CEO, Scott Serrano, Account Executive, Emily Witt, Director of Customer

Services, Erin Dominguez and Molly Dolan, Customer Success Managers,

Convercent could not or would not remedy the deficiencies that made its system virtually unusable.

28.     Based on Convercent's repeated failures, breaches of representations, covenants and warranties, gross negligence, fraudulent misrepresentations and fraudulent inducement, TE terminated the Agreement "for cause" effective July 18, 2018. A true and correct copy of TE's for cause termination letter is attached hereto as Exhibit "C."

29.     As a direct and proximate result of Convercent's numerous misrepresentations, gross negligence, and/or willful failure and deceptive conduct, TE suffered the following damages:

a.     TE paid Convercent $111,270.00 for a system that never worked properly and had to be scrapped.

b.     TE incurred approximately $35,000.00 in costs to hire a temporary employee to work exclusively with Convercent to assist with project implementation due to Convercent's inadequate project management and customer support.

c.     TE paid $10,000.00 for an "Insights and Analytics Module" that was never delivered, because it did not exist.

d.     TE paid Convercent $5,300.00 for a "Hotline SMS Text Intake" package that it did not receive.

e.     TE paid its former vendor, Navex Global, $4,000.00 for data extraction and transfer that was never usable due to Convercent's failure to perform.

f.     TE paid Convercent $1,300.00 for on-site training that it failed to provide.

g.     TE personnel spent countless hours in a futile effort to "trouble shoot" the system as a result of Convercent's failure to deliver a system that was capable of performing as represented.

h.     TE was compelled to purchase an upgraded system from Navex Global, Inc. in order to have a system that worked as promised and as required, at an additional cost of $164,363.14.

## Count I
## Breach of Contract

**30.**   The preceding paragraphs are incorporated by reference herein.

**31.**   Under the terms of the Agreement, Convercent agreed to provide the products and modules specified in the "Statement of Work," together with related support, professional services, training, and implementation necessary to deliver a complete, operational, and usable system for reporting, investigation, and tracking of user complaints.

**32.**   Because of the importance of the product to TE's business operations, the Agreement expressly made time of the essence in Convercent's performance of its obligations as set forth in the Statement of Work.

**33.**   Convercent breached the Agreement by failing to timely deliver the promised product.

**34.**   As a direct result of Convercent's Breach of the Agreement, TE sustained damages as previously set forth herein.

**WHEREFORE,** TE claims damages against the defendant in such amounts as may be proven at trial, together with costs, interest, and such other relief as may be just and proper.

## Count II
## Breach of Express Warranty

**35.**   The preceding paragraphs are incorporated herein by reference.

**36.**   In Section VI(a)(1) of the Agreement, Convercent expressly represented and warranted that it "...shall perform the Services hereunder in a professional and efficient manner, using due care, diligence and at a level equivalent to the standards and practices of comparable companies in the industry, and acknowledges that its failure to perform the Services to the standard shall constitute a material breach of this Agreement."

37.     Convercent breached the within warranty by grossly misrepresenting its own capabilities and the capabilities of its product, failing to exercise due care in the implementation of its obligations under the Agreement, failing to adhere to industry standards in the performances of its duties, failing to provide competent, professional, and knowledgeable personnel, failing to provide systems, hardware, and software that functioned as represented, and failing to deliver a product that was capable of functioning as required under the Agreement.

38.     As a direct result of Convercent's breaches, as aforesaid, TE sustained damages as previously set forth herein.

**WHEREFORE,** TE claims damages against the defendant in such amounts as may be proven at trial, together with costs, interest, and such other relief as may be just and proper.

## Count III
## Breach of Implied Warranties

39.     The preceding paragraphs are incorporated by reference herein.

40.     Convercent knew or should have known that TE was relying on it to select and provide the necessary hardware, software, and expertise necessary to deliver a system that would function as represented and as required in the customer's environment, and represented that its system would satisfy the customer's particular purposes.

41.     Convercent impliedly warranted that the hardware, software and services it promised to provide under the terms of the Agreement would be of merchantable quality and capable of performing as represented in the customer's environment.

42.     Convercent breached its implied warranties of merchantability and fitness for particular purpose by failing to provide hardware, software, and professional support and expertise that functioned as intended and which met TE's particular requirements.

43.     As a direct result of Convercent's breaches, as aforesaid, TE sustained damages as previously set forth herein.

9

**WHEREFORE,** TE claims damages against the defendant in such amounts as may be proven at trial, together with costs, interest, and such other relief as may be just and proper.

### Count IV
### Fraudulent Inducement

44.    The preceding paragraphs are incorporated by reference herein.

45.    As previously stated, Convercent representatives made specific false representations for the purpose of inducing TE to contract with Convercent. Those representations included:

      a.    that Convercent had access to the hardware, software, and expertise necessary to deliver a system capable of meeting TE's requirements;

      b.    that Convercent had the access to hardware, software, and expertise necessary to perform a seamless transition to the new platform and that its system would be fully functional on or before the "go live" date;

      c.    that Convercent was capable of delivering in essence a "turn key" system that would be able to function immediately in place of, and be superior to TE's existing system;

      d.    that Convercent would provide "in-app" translation services that would instantly translate from the reporter's native language to English and vice-versa when no such capability existed;

      e.    that Convercent had an enhanced analytics package when no such package ever existed; and

      f.    that Convercent would provide experienced and capable personnel to ensure a seamless transition when it knew that its personnel lacked the experience and training to deliver same.

46.    Convercent representatives knew at the time they were made that their representations were false, or recklessly disregarded the truth or falsity of those representations, in order to induce TE to enter into the Agreement.

47.    TE relied on Convercent's materially false statements in entering into the Agreement.

**48.**     Convercent's conduct in making knowingly false representations regarding the capabilities of their products of their own expertise, skill, and knowledge for the sole purpose of receiving payment of large sums of money evinced a high degree of dishonesty and moral turpitude as to justify the imposition of punitive damages.

**49.**     As a direct result of Convercent's fraudulent representations, as aforesaid, TE sustained damages as previously set forth herein.

**WHEREFORE,** TE claims damages against the defendant in such amounts as may be proven at trial, and punitive damages, together with costs, interest, and such other relief as may be just and proper.

**Count V**
**Gross Negligence**

**50.**     The preceding paragraphs are incorporated by reference herein.

**51.**     In its prior representations and in the manner in which it performed its services under the Agreement, Convercent intentionally and recklessly disregarded the rights of TE to obtain the benefit of the product and platform it had contracted for and expected to receive in that:

    **a.**     Convercent knew or recklessly disregarded the fact that its product could not be made to function as promised and as represented;

    **b.**     Convercent knew or recklessly disregarded the fact that it lacked the knowledge, skill, and know-how to produce a platform capable of functioning as promised and as represented;

    **c.**     Convercent knew or recklessly disregarded the fact that it lacked the knowledge, skill and resources necessary to ensure a seamless transition from the Navex Global "IntegriLink" system to the Convercent platform;

    **d.**     Convercent knew or recklessly disregarded the fact that it did not have and could not develop an in-app translation capability;

    **e.**     Despite having such knowledge, or having acquired knowledge that its product and platform could not be made to function, Convercent representatives continued to demand and encourage TE to expend large

11

sums of money and large expenditures of time in a futile attempt to make the platform function as intended;

f.     Convercent required TE to purchase additional items that were unnecessary, and which were either never delivered or which failed to function as intended and represented.

**52.**     Convercent engaged in this conduct for the purpose of gaining more revenue and in an effort to conceal its inability to deliver the promised performance, in violation of its special relationship of trust and confidence with TE.

**53.**     Convercent's conduct in acting in a grossly negligent manner, in intentionally disregarding TE's interests, and in violating its special relationship of trust and confidence evinced a high degree of dishonesty and moral turpitude as to justify the imposition of punitive damages.

**54.**     As a direct result of Convercent's grossly negligent conduct, as aforesaid, TE sustained damages as previously set forth herein.

**WHEREFORE,** TE claims damages against the defendant in such amounts as may be proven at trial, and punitive damages, together with costs, interest, and such other relief as may be just and proper.

**DATE:** _May 2, 2019_

**Respectfully submitted,**

**THOMSON, RHODES & COWIE, P.C.**

**BY:** _____

Steven B. Kantrowitz, Esquire
PA 25737
1055 Virginia Drive
Suite 203
Fort Washington, PA 19034

(215) 496-6601

sbk@trc-law.com

Attorneys for TE Connectivity Corporation

12